IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Shane Maynard,                          :

          Plaintiff,                    :

     v.                                 :     Case No. 2:08-cv-1199

Jackson County Ohio, et al.,           :     Magistrate Judge Kemp

          Defendants.                   :

OPINION AND ORDER

On May 27, 2007, plaintiff Shane Maynard was riding his all-
terrain vehicle northbound on State Route 233 in Jackson County,
Ohio, when he encountered a sheriff's cruiser which had pulled
sideways into the northbound lane.  He avoided the cruiser, but
ended up driving his vehicle off an embankment.  Upon hitting the
embankment, Mr. Maynard was ejected from the ATV and suffered
serious physical injuries.

In his complaint, Mr. Maynard claims that both Jackson
County and Scott Conley, a Jackson County Sheriff's Deputy,
violated his rights under the Fourth and Fourteenth Amendments to
the United States Constitution.  He also claims that Deputy
Conley destroyed relevant evidence concerning the accident scene
when he moved his cruiser after the crash.  The case is currently
before the Court to consider the defendants' motion for summary
judgment.  For the following reasons, the defendants' motion will
be granted in part and denied in part consistent with this
Opinion and Order.

I.  Factual Background.

The Court sets out the summary judgment motion standard
below.  Under this familiar standard, the motion must be decided
based upon the version of the facts that favors the plaintiff.
That version of the facts can fairly be stated as follows.

Mr. Maynard began riding his ATV on the morning of May 20, 2007. During the day, he drank eight to ten beers. He then decided to go to a cookout at a friend's house. The route to the cookout took him along State Route 233. He and another ATV rider, Jerry Nichols, at whose home the cookout was planned, entered the roadway sometime in the evening, perhaps around 7:00 p.m.

At the same time, Deputy Conley had been driving his police cruiser along Route 233 looking for the home of an alleged burglary victim. In his deposition, he stated that he had stopped to check the name on a mailbox when he saw the two ATVs enter Route 233 from a side road. Ordinarily, such vehicles should not be operated on the highway. Deputy Conley decided to stop the riders and give them a warning.

After the ATV riders had gone only a short distance on Route 233, Deputy Conley activated the lights on his cruiser. According to him, both riders then "gunned it" as they approached his car. He moved the cruiser slowly forward and also turned his wheels to the side in an effort to display the car's emblem to them. As he did so, the cruiser crossed the yellow dividing line in the center of the road. Mr. Nichols, upon seeing the cruiser, made a u-turn. Mr. Maynard swerved off the road to his right, went through someone's yard, hit some railroad ties next to a creek, and became airborne. Both the vehicle and Mr. Maynard landed in the creek. Deputy Conley went over to the scene of the crash and held Mr. Maynard's head out of the water until the fire department arrived. He moved his cruiser out of the roadway before he did so.

The primary factual dispute in this case is whether Mr. Maynard was forced to leave the roadway in order to avoid striking Deputy Conley's cruiser. According to Deputy Conley, he had moved his car no more than one-quarter of the way into Mr.

2

Maynard's lane of traffic, and there was more than enough room for Mr. Maynard to drive around him. He also believed Mr. Maynard could have stopped his ATV short of the cruiser.

Mr. Maynard's version is quite different. He testified in his deposition that when he first saw the cruiser, he did not realize it was a police car. By the time he saw it, he was already moving toward the berm of the road so as not to be riding on the paved roadway. Next, he saw the car flashing its headlights and crossing into his lane of travel. He attempted to brake his vehicle. By that time, the car (which he still did not recognize as a cruiser) had taken up the entire lane of travel. He veered into the grass in order to avoid hitting the car, but he was unable to stop the vehicle before he crashed into the creek.

Mr. Nichols was also deposed, and gave a similar account. He also saw the cruiser pulling into his lane of travel. At that time, Mr. Maynard was riding in front of him. Although he did not see the overhead lights activated, he did see the Sheriff's Department emblem on the door. At that point, he turned his vehicle around. Shortly afterward, he looked back and saw Mr. Maynard trying to avoid the cruiser, which was blocking the entire northbound lane of the road. However, he did not see the crash. Rather, he left the scene in order to avoid getting a ticket.

All of this happened right in front of the home of Yvonne McFann. She was also deposed. She said that shortly before the crash she was standing on her porch. She saw the cruiser crossing the roadway toward her driveway and then heard the ATVs coming. The lead ATV then crossed the edge of the road into her driveway. From her vantage point, the driver had two choices at that point: to hit the cruiser or to veer off through her yard. She believed he tried to brake as he approached the cruiser, but

3

he clearly had to swerve in order to avoid a collision.

From this recitation of the testimony, there is clearly a dispute about how far Deputy Conley pulled across Mr. Maynard's lane of travel, and whether his actions forced Mr. Maynard to leave the roadway and end up crashing into the creek. Nevertheless, Deputy Conley has moved for summary judgment on the grounds that his actions did not constitute an unreasonable seizure under the Fourth Amendment. He also disputes that when he moved his cruiser after the crash occurred, he spoiled evidence in the case, and both defendants argue that there is no basis for holding Jackson County liable for Deputy Conley's actions. The Court will analyze these issues after reciting the appropriate summary judgment standard.

## II. <u>Summary Judgment Standard</u>.

Summary judgment is not a substitute for a trial when facts material to the Court's ultimate resolution of the case are in dispute. It may be rendered only when appropriate evidentiary materials, as described in Fed. R. Civ. P. 56(c), demonstrate the absence of a material factual dispute and the moving party is entitled to judgment as a matter of law. <u>Poller v. Columbia Broadcasting Systems, Inc.</u>, 368 U.S. 464 (1962). The moving party bears the burden of demonstrating that no material facts are in dispute, and the evidence submitted must be viewed in the light most favorable to the nonmoving party. <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144 (1970). Additionally, the Court must draw all reasonable inferences from that evidence in favor of the nonmoving party. <u>United States v. Diebold, Inc.</u>, 369 U.S. 654 (1962). The nonmoving party does have the burden, however, after completion of sufficient discovery, to submit evidence in support of any material element of a claim or defense on which that party would bear the burden of proof at trial,

even if the moving party has not submitted evidence to negate the existence of that material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  Of course, since "a party seeking summary judgment ... bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact," Celotex, 477 U.S. at 323, the responding party is only required to respond to those issues clearly identified by the moving party as being subject to the motion.  It is with these standards in mind that the instant motion must be decided.

### III. Legal Analysis

#### A.  The §1983 claim against Deputy Conley

The elements of a constitutional claim which is brought under 42 U.S.C. §1983 are familiar.  By its terms, that statute requires proof that the party being sued was acting "under color of a[] statute, ordinance, regulation, custom or usage, of a[] State," that the plaintiff is a "citizen" or "person" entitled to bring suit under that statute, and that the defendant subjected the plaintiff "to the deprivation of ... rights, privileges, or immunities secured by the Constitution" of the United States. See, e.g., Flagg Bros. v. Brooks, 436 U.S. 149, 155 (1978); Searcy v. City of Dayton, 38 F.3d 282, 286 (6th Cir. 1994). Here, there is no dispute about Mr. Maynard's right to sue for relief under this statute or that Deputy Conley was acting under color of state law when he pulled his cruiser across the road. The only disputed legal issue is whether, if he did what Mr. Maynard says he did, his actions deprived Mr. Maynard of some constitutional right.

The first step in the analysis is identifying the specific constitutional right which the injured party claims to have been

violated. The Fourth Amendment protects citizens against unreasonable federal governmental searches and seizures. Its protections have been incorporated into the Fourteenth Amendment's due process clause so that they apply to actions by the States as well. Mr. Maynard asserts that he was "seized" in violation of the Fourth Amendment when his passage along Route 233 was impeded by Deputy Conley's cruiser, and that because Deputy Conley had no basis for attempting to seize Mr. Maynard in that way, the seizure was unreasonable. If both of those assertions are correct, then a jury, if it believed Mr. Maynard's version of the events in question, could find for him on his Fourth Amendment claim.

      B. <u>Could a Jury Find a Fourth Amendment "Seizure"?</u>

It might not be intuitively apparent that if a police officer causes an automobile or vehicle accident, he or she has "seized" someone within the meaning of the Fourth Amendment. Of course, motor vehicle accidents were certainly not within the contemplation of the authors of the Bill of Rights. Nevertheless, since the advent of the motor vehicle, the courts have been required to consider whether an officer's conduct during a vehicle pursuit or in setting up a roadblock to stop a moving vehicle can constitute a Fourth Amendment seizure. Based upon the reasons why the Fourth Amendment prohibits unlawful seizures, these decisions announce principles that allow this Court to answer the question of whether Mr. Maynard's Fourth Amendment rights may have been violated.

In <u>Brower v. County of Inyo</u>, 489 U.S. 593 (1989), the Supreme Court was presented, apparently for the first time, with the question of whether a police roadblock, if successful in stopping a fleeing suspect, qualified as a "seizure" within the meaning of the Fourth Amendment. In that case, police had been chasing what they believed to be a stolen vehicle, and at some

point during the chase, ordered a roadblock established.  The
roadblock, which consisted of a tractor-trailer, blocked the
entire highway on which the chase was taking place.  The vehicle
crashed into the roadblock and the driver was killed.  The
question before the Court was whether he had been "seized" for
Fourth Amendment purposes by the roadblock.

The Court began its analysis of the question by citing to
Tennessee v. Garner, 471 U.S. 1 (1985), a case in which a fleeing
felon had been shot by a police officer.  Garner held that such
an action was a "seizure" because it had the effect of
restraining the suspect's freedom to walk away from his encounter
with the police.  The Court held that a roadblock effects the
same type of restraint; certainly, once a suspect has crashed
into the roadblock and come to a stop, his or her freedom to walk
away has been restrained.

In Brower, the state had argued that a police roadblock case
resulting in the crash of the suspect's vehicle was no different
from a police pursuit case leading to the same result, and that
courts which had considered pursuit cases had come to the
conclusion that no seizure occurred there even if the pursuit
caused the crash.  The Court of Appeals in that case had agreed,
holding that because the suspect could have stopped his car at
any time during the chase but chose not to do so, "his freedom of
movement was never arrested or restrained."  Brower v. Inyo
County, 817 F.2d 540, 546 (9th Cir. 1987).

Although the Supreme Court agreed that no seizure occurs
when a suspect who is being chased by the police "unexpectedly
loses control of his car and crashes," its reasoning differed
from that articulated by the Court of Appeals.  The Court
explained that a seizure in violation of the Fourth Amendment
takes place "only when there is a governmental termination of
freedom of movement *through means intentionally applied*."  Id. at

597.  In the case of an officer using only flashing lights in an attempt to pull over a suspect, there is no seizure, even though the fleeing car subsequently crashes, because the suspect "was stopped by a different means - his loss of control of his vehicle and the subsequent crash." Id.  In contrast to that situation, "a roadblock is not just a significant show of authority to induce a voluntary stop, but is designed to produce a stop by physical impact if voluntary compliance does not occur." Id. at 598.  The Court declined to draw a distinction between types of roadblocks, noting that whether a roadblock was located far enough down the road to allow the suspect time to stop, or located just around a corner where stopping would have been impossible, if the roadblock accomplished its purpose of stopping the suspect, that suspect has been "seized" by that roadblock, which was "the very instrumentality set in motion or put in place in order to achieve that result." Id. at 599.  The type of roadblock and its placement were deemed relevant not to whether a seizure had occurred, but to whether that seizure was reasonable.

To a great extent, the defendants' argument that no seizure occurred is based solely upon Deputy Conley's testimony that he did not pull fully into the northbound lane and that he did not block Mr. Maynard's path of travel.  Clearly, that factual scenario is disputed, and a jury could find that Deputy Conley's version of the facts is not accurate.  It would be totally improper, under the applicable summary judgment standard, for the Court to conduct a Fourth Amendment analysis based on the defendants' version of disputed facts.

The defendants do offer an alternative argument, however, that seems to concede at least some of the facts as alleged by Mr. Maynard.  That argument appears to have two parts: either that, even under Mr. Maynard's version of the facts, he had room to pass Deputy Conley's cruiser on the berm of the road, or, as

everyone agrees, Mr. Maynard did not actually come into contact with the cruiser. According to defendants, the former fact proves that there was no "roadblock," while the latter fact would prevent a jury from finding that any roadblock which might have been formed by the cruiser actually caused Mr. Maynard to stop.

The first part of this argument fails because it, too, relies on a "fact" that is reasonably subject to dispute. Whether the cruiser was pulled part or all of the way across Mr. Maynard's lane of travel, or even partly into the driveway of Ms. McFann's residence, is an issue for the jury. Similarly, whether Mr. Maynard had room to maneuver safely around the cruiser is also a jury issue. The evidence is simply in conflict about whether he had a reasonable opportunity to avoid hitting the cruiser by taking a safe path around it.

The second part of this argument fails for a different reason. A hypothetical example shows why. Suppose a police roadblock, consisting of police cruisers, is set up across a roadway at a point where other objects - rock formations, bridge abutments, or other typical side-of-the-road obstructions - would make it impossible for someone to drive around the roadblock. As the suspect approaches the roadblock and determines that he is unable to stop, he chooses to crash his vehicle into one of these objects rather than the police cars themselves. If the defendants' argument were accepted, the constitutional question of whether a seizure had occurred would depend entirely on which object caused the suspect's vehicle to come to a stop. Surely the proper interpretation of the constitution cannot depend upon these types of variables.

Here, under Mr. Maynard's version of events, his vehicle came to a stop, and he was seized within the meaning of the Fourth Amendment, as a direct result of the means intentionally chosen by Deputy Conley, whose actions insured either that Mr.

Maynard would be stopped by the cruiser itself or by some feature of the surrounding landscape that was put into play - and thereby incorporated into the "roadblock" - precisely because Deputy Conley forced Mr. Maynard to encounter it. Under <u>Brower</u>, the relevant questions are (1) whether the police conduct intended to cause someone to stop by means of the roadblock, and (2) whether the roadblock accomplished that very purpose. Here, the jury could conclude that this is exactly what happened even though Mr. Maynard collided with an embankment rather than the cruiser itself.

Other courts have analyzed this issue in the same way. For example, in <u>Johnson v. Grob</u>, 928 F.Supp. 889, 897 (W.D. Mo. 1996), the court constructed a remarkably similar hypothetical based on <u>Brower</u>, assuming "for purposes of argument that Brower, in a state of panic, had not crashed into the roadblock but had instead swerved off the road and into a tree." The court concluded that "[a]t that point, Brower would still have been seized as a result of the crash." <u>Id</u>. The court also observed that "[a] suspect who swerves to avoid an unreasonable roadblock chooses not to flee justice but to save his life ...." <u>Id</u>. at 899. Thus, for all of these reasons, the Court cannot accept the defendants' argument that there is no version of the facts which would support a finding that Mr. Maynard was seized for Fourth Amendment purposes.

C. <u>Could a Jury Find the Seizure Unreasonable?</u>

The defendants also argue that to the extent Deputy Conley's actions constituted a seizure, those actions were not unreasonable. They point out that the reason Deputy Conley pulled across the road was to allow the two ATV riders to see the emblem on the side of his cruiser. In their words, "[t]he officer attempted to stop two individuals by allowing them to see that he was a law enforcement officer." Defendant's memorandum,

10

Doc. #26, at 14.  The reasonableness of this conduct seems
evident to the defendants because Mr. Nichols was able to slow
down his ATV and reverse course after seeing the emblem.
However, they continue to rely on Deputy Conley's testimony that
he "did not pull fully into the northbound lane.  He gave the
ATVs enough room to pass and plenty to (sic) time to stop or turn
around." Id.  They then characterize Mr. Maynard's actions as
unreasonable because he chose not to take either of these options
– stopping or traveling a safe path around the cruiser – and
instead voluntary chose to run off the road and crash down the
embankment.

    Mr. Nichols' ability to stop and turn around is clearly not
determinative of the reasonableness of Deputy Conley's actions.
For one thing, Mr. Nichols was further away from the cruiser than
Mr. Maynard was when it began to pull across the road.  The fact
that he had time to turn around does not prove beyond dispute
that Mr. Maynard could have done the same.  A jury could believe
Mr. Maynard's testimony, and the other evidence corroborating his
testimony, that he did not have time to stop.  Further, the
defendants are again inviting the Court to determine the
reasonableness of Deputy Conley's conduct based on his testimony
alone.  The Court may not do so.  Distilled to its essence,
defendant's argument on this point is that Deputy Conley's
actions, even if they constituted a seizure, were reasonable
because he left Mr. Maynard with a safe pathway around his
cruiser.  This precise fact is in dispute, and the Court cannot
grant summary judgment when that is the case.

### D.  Section 1983 Issues Not Raised

    The defendants spend a portion of their memorandum outlining
the contours of the qualified immunity doctrine.  Under that
doctrine, once the Court determines that a constitutional
violation has occurred (or that a jury could so find), the Court

must, if asked by the defendant, determine if the right in question was clearly established at the time the defendant acted. See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Dominique v. Telb, 831 F.2d 673 (6th Cir. 1987). Defendants do not argue that the Fourth Amendment right not to be seized by an unreasonably-erected police roadblock was not clearly established in 2007, and in light of decisions like Brower and Buckner v. Kilgore, 36 F.3d 536 (6th Cir. 1994), they would be hard-pressed to make such an argument. Because the defendants's qualified immunity argument focuses solely on issues relating to whether a jury could find a Fourth Amendment violation here, the Court will not address this aspect of qualified immunity.

Defendants also do not argue that, if Deputy Conley actually established a roadblock that Mr. Maynard could not safely avoid, he had a reasonable basis for doing so. Again, given the fact that Mr. Maynard may have been committing, at most, a minor misdemeanor, it would seem that any argument that potentially deadly force, or force designed to cause serious bodily injury, could reasonably have been used to stop Mr. Maynard would fail. Nonetheless, because defendants have not advanced any argument on this point, the Court makes no decision on the issue.

E. §1983 Claims against Jackson County, Ohio

Since the Supreme Court's decision in Monell v. Department of Social Services, 436 U.S. 658 (1978), municipal governmental bodies such as cities and counties have been considered as "persons" who can be sued under 42 U.S.C. §1983. However, Monell made clear that a municipality cannot be held liable under that statute simply because it employed the individual who violated the plaintiff's constitutional rights. Rather, the plaintiff must prove that the individual's actions can legitimately be viewed as the actions of the county itself.

In decisions handed down after Monell, the Supreme Court

outlined various avenues for that type of proof.  One of the most
frequently attempted methods for holding a municipal body liable
for the actions of its employees is to show that the municipality
had a policy or practice of failing to give adequate training to
its employees about how to behave in situations they are likely
to encounter.  If those untrained employees then violate the
constitution in such a situation, it may fairly be said that the
cause of that violation was the county's failure to train it
employees to do otherwise.  <u>See, e.g., City of Canton v. Harris</u>,
489 U.S. 378, 389 (1989).

However, not just any failure to train will do.  As the
<u>Harris</u> court observed, "it may happen that in light of the duties
assigned to specific officers ... the need for more or different
training is so obvious, and the inadequacy so likely to result in
the violation of constitutional rights, that the policymakers of
the [county] can reasonably have been said to have been
deliberately indifferent to the need."  If that is so, "the
failure to provide proper training may fairly be said to
represent a policy for which the [county] is responsible, and for
which the [county] may be held liable if it actually causes
injury."  <u>Id</u>. at 390 (footnotes omitted).  For liability to
attach under this theory, the plaintiff must also prove that "the
identified deficiency in a [county]'s training program [is]
closely related to the ultimate injury."  <u>Id</u>. at 391.  Further,
it is important to keep in mind that even if "a particular
officer may be unsatisfactorily trained, [that fact] will not
alone suffice to fasten liability on the [county]" and that the
negligent administration of "an otherwise sound program" is not a
basis for §1983 liability.  Finally, the <u>Harris</u> court pointed
out, and it is worth remembering, that "adequately trained
officers occasionally make mistakes, [and] the fact that they do
says little about the training program or the legal basis for

13

holding the [county] liable." <u>Id</u>.

The County's summary judgment motion sets forth several reasons why, in its view, Mr. Maynard cannot prove this claim. First, it points out that if Deputy Conley is entitled to summary judgment on the claim asserted against him in his individual capacity, it cannot be held liable for his actions, either. However, this argument is foreclosed by the Court's ruling that a jury could find Deputy Conley liable. In a related argument, it asserts that Deputy Conley acted like "an appropriately trained and supervised police officer" because, in his deposition, he testified that he left Mr. Maynard a safe path of travel. Defendant's memorandum, at 21. Of course, because this fact is also in dispute, the Court may not resolve the issue of the County's liability on this basis.

Next, the County argues that Mr. Maynard has not identified any written policy it has adopted that led to the crash. That much is true, but his claims against Jackson County are not based on an assertion that Deputy Conley was following a prescribed policy when he pulled his cruiser over in an attempt to stop Mr. Maynard. Rather, his claims are based on the assertion that Deputy Conley was neither aware of nor adequately trained about the County's roadblock policy.

Finally, the County argues that the record does not contain any facts from which a jury could find an actionable failure to train. It asserts, for example, that Mr. Maynard will not be able to produce any evidence that Deputy Conley ever used an unreasonable road-blocking technique in the past, so that Jackson County could not have been aware that he was not adequately trained in this area. It also notes that he is a certified law enforcement officer in the State of Ohio, although it has not presented any evidence about what training, if any, certified law enforcement officer usually receive concerning using their police

cruisers to stop oncoming motorists. The argument that there are
no facts in the record to support the claim that the County could
be liable for Deputy Conley's actions is sufficient under <u>Celotex
Corp. v. Catrett</u>, 477 U.S. 317 (1986), to place the burden on Mr.
Maynard to produce enough evidence to show that a reasonable jury
could find in his favor on this issue.

According to Mr. Maynard, Jackson County can be held
responsible for Deputy Conley's actions in this case because it
gave him no training regarding the proper use of roadblocks and,
following the test set forth in <u>Harris</u>, it should have been
obvious to County officials that if a patrol officer does not
know how properly to use a vehicle to effect a traffic stop,
constitutional violations such as the one alleged in this case
are likely to occur. The question then becomes whether there are
any facts in the record showing that this might be true.

At his deposition, Deputy Conley was asked about the
training he received from Jackson County on the use of his
cruiser to block oncoming traffic. When asked to define a
roadblock, he testified that he did not "have the definition of a
roadblock available." Conley Deposition, Doc. #31, at 109. He
said that the question of roadblocks "might be" addressed in the
Jackson County Sheriff's policies, but he did not know. <u>Id</u>. He
did say, however, that he did not "recall specific training on
roadblocks." <u>Id</u>. He knew about the County's pursuit policy,
however, and was aware that he could initiate a chase only if the
suspect was believed to be a violent felon. <u>Id</u>. at 110. After
being shown the pursuit policy, he acknowledged that setting up a
roadblock was part of the pursuit policy, and that the policy
said that roadblocks could be authorized only by patrol
supervisors or senior deputies. He further agreed that the
policy prohibited using occupied vehicles for a roadblock and
that any roadblock had to leave room for a slow-moving vehicle to

15

pass through it.  Id. at 113-14.  He refused to characterize his action in pulling his cruiser at least halfway across Mr. Maynard's lane of travel as a roadblock, however.

The only other witness who testified on this issue was Jackson County Sheriff John Shasteen.  Sheriff Shasteen testified, first, about training in general, stating that "We haven't been able to do a lot of training.  We can't afford to send people to training.  So the training most officers here have is they go to school on their own, pay for it themselves, or they received it in the basic police course."  Shasteen Deposition, Doc. #34, at 18.  When asked about the road patrol policies, he testified that after he took office (which was in 2001) he obtained written policies from Montgomery County and distributed them to his officers.  Id.  Counsel then inquired about what kind of training Jackson County officers received on the policies. Sheriff Shasteen responded that "it's hard to explain.  There hasn't been that much training."  Id. at 19.  Jackson County has not had a training officer since 2005.  Id. at 22.  Sheriff Shasteen himself had never received any training on the way in which the Fourth Amendment applies to roadblocks.  Id. at 30. Finally, he acknowledged that injuries can occur if a vehicle stop is not done properly, and that he could not say that he did anything "to make sure that before [he] gave [Deputy] Conley the keys to that cruiser, he knew how to properly stop people."  Id. at 45.  Rather, he relied on the fact that Deputy Conley "had his training as all deputy sheriffs across the state has."  Id. at 46.

Although it is a close question, the Court concludes that, based on the testimony of these two witnesses, a reasonable jury could conclude that Jackson County's training program is inadequate regarding the tasks that its road officers must perform.  Other decisions support this conclusion.  For example,

16

in <u>Hockenberry v. Village of Carrollton</u>, 110 F.Supp.2d 597, 602 (N.D. Ohio 2000), the court held that a jury question existed on the issue of municipal liability because the Village had provided only one training course on its policies and procedures and the officer involved in the incident (a police pursuit that led to a crash) had never been tested on the procedures.   And in <u>Harvey v. Campbell County, Tenn.</u>, 2008 WL 5429646, *4-*5 (E.D. Tenn. Dec. 30, 2008), the court held that a triable issue existed about the adequacy of a county's training policies where the County's training on the use of deadly force consisted of providing written policies to the officers and relying on their general law enforcement training, which included forty hours of in-service training each year.   The court noted that "without any indication as to the full extent" of the officer's training and without "specific evidence regarding the nature and extent of his [previous] training," reasonable minds could differ on whether the training provided was adequate.

     This case presents even stronger reasons to conclude that issues of fact exist on the training question.   As in <u>Harvey</u>, there is no evidence about what general training Jackson County deputies receive before they are allowed to work as law enforcement officers.   Further, unlike the situation described in <u>Harvey</u>, it does not appear that Jackson County offered any in-service training to its road deputies other than having them ride in a cruiser with another officer.   Further, unlike the department involved in <u>Hockenberry</u>, Jackson County has not shown that it offered even one general training course to its road deputies on its policies and procedures.   It also appears to be the case that Jackson County deputies, like Village of Carrollton officers, are not tested on those policies.   Given the seriousness of the injuries that can result from improper use of a vehicle to stop oncoming traffic - injuries to both the public

and the involved officer, which can, under some circumstances, be fatal - and the apparent lack of any training provided to its road deputies, a jury could (although it would not have to) find that Jackson County has adopted a policy of not training its officers and that, by doing so, it has been deliberately indifferent to the possibility that those untrained officers will violate the constitution.  Because the failure to train deputies on road policies also is closely related to Deputy Conley's actions on the day in question, the issue of municipal liability is one for the jury.

Mr. Maynard does make several other arguments in support of his claim that Jackson County can be held directly liable here. One of those arguments is that Jackson County did not properly supervise Deputy Conley.  This claim appears to be based almost entirely on the fact that Jackson County did not discipline Deputy Conley for his actions on the day in question.  Mr. Maynard argues that this inaction on the County's part is a ratification of Deputy Conley's unconstitutional behavior and that this shows its deliberate indifference to Mr. Maynard's constitutional rights.

The Court of Appeals for the Sixth Circuit has held in at least two decisions that a sheriff's failure to investigate incidents of police abuse and to discipline the officers involved may constitute ratification of the illegal acts and may amount to deliberate indifference to the constitutional rights of the victims of the misconduct.  See Leach v. Shelby County Sheriff, 891 F.2d 1241, 1248 (6th Cir. 1989); Marchese v. Lucas, 758 F.2d 181, 188 (6th Cir. 1985).  Under Ohio law, the sheriff is the chief law enforcement officer in each county,  State ex rel. Watson v. Hamilton Cty. Bd. of Elections, 88 Ohio St.3d 239, 244 (2000), and makes policy for the county with regard to the operation of his office and the discharge of his duties.  Stone

v. Holzberger, 807 F.Supp. 1325, 1335 (S.D. Ohio 1992).
Accordingly, if a sheriff does ratify the unconstitutional
behavior of his deputies or officers, he may make the county
liable for their actions.  Id. at 1335-1336; see also Marchese,
758 F.2d at 189 (construing Michigan law).

     This case, however, is different from the situations
addressed in the Court of Appeals' decisions.  Neither Leach nor
Marchese involved a single, isolated incident.  In Leach, the
district court found numerous instances of abuse of paraplegic or
physically infirm inmates in addition to the plaintiff's own
deplorable treatment at the hands of his jailers.  891 F.2d at
1247-48.  The Court of Appeals held that given this pattern of
abuse, "the need for more adequate supervision was so obvious and
the likelihood that the inadequacy would result in the violation
of constitutional rights was so great that the County as an
entity [could] be held liable..."  Id. at 1248.  In Marchese, the
same inmate, who had earlier threatened a sheriff's deputy with a
gun, was beaten on two separate occasions while in the presence
and custody of other deputies.  758 F.2d at 188.

     In the present case, the only time that Sheriff Shasteen
allegedly failed to conduct a proper investigation into Deputy
Conley's conduct and failed to discipline him is the incident
with Mr. Maynard.  There is no evidence that Deputy Conley
violated the roadblock policy on other occasions or that other
deputies violated the road policies but were not disciplined.
Therefore, the Sheriff's failure to discipline Deputy Conley's
conduct on this single occasion (which, as the Sheriff explained,
was based on the fact that he believed Deputy Conley's version of
the events) "cannot logically be the moving force behind the
alleged constitutional violation."  Swann v. City of Columbus,
No. 2:04-cv-578, 2007 WL 1831131 at *3 (S.D. Ohio Jun. 25,
2007)(Holschuh, J.); see also Ellis ex rel. Pendergrass v.

Cleveland Mun. School Dist., 455 F.3d 690, 701 n. 5 (6th Cir. 2006)("We have not found any legal support for the proposition that, in the absence of deliberate indifference before a constitutional violation, a municipality may be liable for simply failing to investigate or punish a wrongdoer *after* the violation").  Thus, the only theory of liability which Mr. Maynard may pursue against Jackson County is the one based on failure to train.

## F. The Spoliation of Evidence Claim

The complaint also pleads a cause of action under state law for spoliation of evidence.  As discussed earlier, Mr. Maynard claims that he was unable to continue safely past Deputy Conley's cruiser because the cruiser was blocking the entire roadway. That is a fact in dispute.  There is no dispute, however, that as soon as Mr. Maynard's vehicle crashed into the ditch, Deputy Conley pulled his cruiser into Ms. McFann's driveway.  According to his deposition, Deputy Conley did so "to avoid any other crashes and render [Mr. Maynard] assistance."  Conley deposition, at 88.  Despite this testimony, Mr. Maynard claims that a jury could conclude that Deputy Conley had another reason for taking that action - to prevent investigators from learning that he had blocked the roadway with his cruiser, thus making it more difficult for Mr. Maynard to prove his legal claims.  The questions raised by this claim and Deputy Conley's motion for summary judgment are whether Ohio law recognizes a spoliation of evidence claim based on this type of conduct, and whether a reasonable jury could infer that all of the required elements of a spoliation claim are present here.

The Ohio Supreme Court has recognized a common law cause of action in tort for interference with or destruction of evidence. See Smith v. Howard Johnson Co., 67 Ohio St.3d 28 (1993).  To prevail on such a claim (also known as spoliation of evidence), a

plaintiff must prove (1) pending or probable litigation involving the plaintiff, (2) the defendant's knowledge that litigation is pending or probable, (3) the defendant's willful destruction of evidence in order to disrupt the plaintiff's case, (4) actual disruption of the plaintiff's case, and (5) damages proximately caused by the defendant's actions. <u>Id</u>. at 29.

Deputy Conley makes one legal argument and several factual arguments in support of his motion for summary judgment on this claim. As a factual matter, he asserts that a jury could not reasonably infer many of the factual predicates of the claim. For example, he argues that when he moved his cruiser, a reasonable person knowing the details of the accident could not have foreseen that a lawsuit would be filed. He also argues that willfulness cannot be inferred because there is no evidence that he moved his vehicle with the intent to destroy relevant evidence. In addition, he asserts that Mr. Maynard's case was not disrupted because he was able to file this case. Finally, he asserts that under Ohio law, in order to make out a valid spoliation claim, a plaintiff must prove the physical destruction of tangible evidence and not simply the physical rearrangement of evidence at a crime or accident scene.

Several of these arguments are tenuous at best. In similar circumstances, courts have held that immediately after a motor vehicle accident occurs, reasonable people can anticipate that a lawsuit may be filed. As the Indiana Court of Appeals observed in <u>Burton v. Estate of Davis</u>, 730 N.E.2d 800, 805 (Ind. App.), <u>opinion vacated upon settlement</u>, 740 N.E.2d 850 (Ind. 2000), "[i]t should come as no surprise to a motorist who negligently caused a vehicular accident that his negligence will result in litigation and that the evidence at the accident scene will be a focus of that litigation." Additionally, in order to prove prejudice from the destruction of evidence, a plaintiff need not

show that he or she was completely prevented from filing suit, but only that, without the evidence in question, it will be more difficult to prove the case. See, e.g., Green v. Taylor, No. 1:03-cv-1084 (N.D. Ohio April 11, 2006), aff'd on other grounds 239 Fed. Appx. 952 (6th Cir. 2007). Finally, as Judge Oliver's decision in Green notes, moving a vehicle after a crash is an interference or manipulation of physical evidence, and that type of act can support a spoliation claim under Ohio law. However, the Court finds that the defense based on the lack of evidence of willful conduct has merit.

In a spoliation case, the term "willful" denotes both the intentional and wrongful commission of an act. White v. Ford Motor Co., 142 Ohio App.3d 384, 387 (Franklin Co. App. 2001), citing Drawl v. Cornicelli, 124 Ohio App.3d 562, 567 (Lake Co. App. 1997). Acts that are willful include those committed with premeditation, malice, or a bad purpose. See Drawl, citing Black's Law Dictionary 1599 (6th ed. 1990). When different motives could cause the party accused of destroying evidence to have acted in a certain way, a complaint alleging willful conduct is sufficient. However, if the defendant presents evidence that he or she had a legitimate reason for the actions in question, the plaintiff "will have to do more than merely assert the contrary in his pleadings to avoid summary judgment." Hibbits v. Sides, 34 P.3d 327, 330 (Alaska 2001).

Here, the only evidence about why Deputy Conley moved his cruiser is his deposition testimony. He gave two reasons for his actions: to clear the roadway to prevent other crashes, and to help Mr. Maynard. He could have done the latter even if his cruiser had stayed on the roadway, but he could not have done the former. Under Mr. Maynard's version of the facts, which the Court must accept as true for purposes of ruling on this motion, the cruiser was blocking the entire roadway. Route 233 is a

state highway. It would have been grossly unreasonable for Deputy Conley simply to have left the cruiser in that position. Even if he could have placed flares or markers out to stop traffic, to do so would have prevented him from immediately helping Mr. Maynard, who was lying face-down in a creek. This evidence is so strong as to foreclose other reasonable inferences about Deputy's Conley's motivation, including the inference that he moved his cruiser so that it would be harder for Mr. Maynard to file and prove a claim against him.

Mr. Maynard argues that an intent to destroy evidence can be inferred from the fact that, when Deputy Conley was interviewed about the accident, he failed to mention that he had pulled his cruiser even part-way into Mr. Maynard's lane of travel. There may be cases where an intentional falsehood about the circumstances of an accident, made shortly after evidence is manipulated or destroyed, will support an inference that the manipulation or destruction of the evidence was willful, but this is not one of them. Deputy Conley has consistently maintained that the sole cause of the crash was Mr. Maynard's deliberate choice to drive off the roadway in an effort to elude capture, and that the cruiser did not block Mr. Maynard's path. The investigating officer also had the benefit of Mr. Maynard's statement about how the crash occurred, and there is no evidence that Deputy Conley lied about the position of his cruiser - he apparently was not asked that question. Consequently, the most that can be said is that he did not volunteer any information about the position of his cruiser. Under all of these circumstances, a reasonable jury could not conclude, solely from that omission, that Deputy Conley acted willfully when he pulled his cruiser into Ms. McFann's driveway immediately after Mr. Maynard went into the ditch. Summary judgment is therefore appropriate on this claim.

## IV. Conclusion

For the foregoing reasons, the Court grants in part and denies in part the defendants' motion for summary judgment (#26). Summary judgment is granted to the defendants on Mr. Maynard's §1983 claim against Jackson County under a failure-to-supervise theory and on his spoliation of evidence claim.  The remaining claims will proceed to trial.

/s/ Terence P. Kemp
United States Magistrate Judge